# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **SHELBY HENNEGHAN,** : | |
|   **Plaintiff,** : | |
| : | |
| **v.** : | **Civil Action No. 3:16-cv-01507 (VLB)** |
| : | |
| **NANCY A. BERRYHILL[1],** : | |
| **ACTING COMMISSIONER OF** : | **March 14, 2018** |
| **SOCIAL SECURITY,** : | |
|   **Defendant.** : | |

## RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This is an administrative appeal following the denial of Shelby Henneghan's application for disability insurance benefits and supplemental security income benefits under 42 U.S.C. §§ 405(g) and 1383(c)(3).[2] Shelby Henneghan ("Henneghan") has moved for an order reversing or remanding the decision of the Commissioner of the Social Security Administration ("Commissioner"). [Dkt. 17.] The Commissioner has moved for an order

---

[1] This case was originally brought against Defendant Carolyn Colvin, then-Commissioner of Social Security. The Acting Commissioner of Social Security is now Nancy Berryhill, and she is substituted as the Defendant in this suit. Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g).

[2] Under the Social Security Act ("SSA"), the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. § 405(b)(1). The Commissioner's authority to make such findings and decisions is delegated to administrative law judges ("ALJs"). *See* C.F.R. §§ 404.929 *et seq.* Plaintiffs can in turn appeal an ALJ's decision to the Social Security Appeals Council. *See* 20 C.F.R. §§ 404.967 *et seq.* If the appeals council declines review or affirms the ALJ opinion, the Plaintiff may appeal to the United States district court. Section 205(g) of the SSA provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

affirming the decision.  [Dkt. 18.]  For the following reasons, Henneghan's motion
is granted in part and denied in part.

I. <u>Factual Background</u>

The following facts are derived from the record provided by the Social
Security Administration.

Shelby Henneghan is a 51 year old woman currently residing in a homeless
shelter.  She is separated from her husband and has three adult children.  Ms.
Henneghan has a history of mental disorders, substance abuse, diabetes, and
hypertension and has been treated for edema, anemia, peripheral neuropathy,
and migraines.

a. <u>Medical History Prior to Onset</u>

On March 5, 2009, Ms. Henneghan reported to Dr. Raymond Stewart at
Optimus Health Care experiencing instability and popping in her right knee.  [R. at
500.]  Dr. Stewart conducted an MRI, and noted "a small amount of joint fluid at
the upper limits of normal."  *Id.*  Two months later, she underwent arthroscopic
surgery of the right knee.  [R. at 381.]

On July 1, 2009, Ms. Henneghan was admitted to Greenwich Hospital for
detoxification from heroin.  [R. at 379.]  She reported a history of smoking
cigarettes and marijuana since the age of 10, and a history of using cocaine and
heroin since the age of 13.  *Id.*  Henneghan reported having periods of abstinence
as long as 7.5 years, but stated a 5-year period of abstinence ended two months
prior when she was prescribed Percocet after her knee surgery.  *Id.*  After her
prescription ran out, Henneghan reported that she began using up to five bags of

heroin per day.  *Id*.  Her medical history at that time included hypertension and depression.  *Id*.

On July 23, 2009, Henneghan contacted Optimus Health Care (Stratford) stating she was depressed.  [R. at 508.]  She was referred for a clinical evaluation on July 28, 2009, and after that assessment was referred to a therapist for major depressive disorder.  *Id*.

On September 2, 2009, Henneghan returned to Greenwich Hospital to detox.  [R. at 389].  She reported that, while she refrained from substance abuse for two weeks after her prior detox, she relapsed following an argument and she began using 8-12 bags of heroin per day and sporadically using crack cocaine. *Id*.  On October 3, 2009, Henneghan was admitted to Bridgeport Hospital reporting abdominal pain.  [R. at 481.]  Dr. Pawan Dhawan found that her abdominal pain was caused by gastroparesis and gastric outlet syndrome related to a gastric-bypass surgery Henneghan underwent in 2003.  *Id*.  She also tested positive for cocaine and opiates.  [R. at 481-82].  She was discharged with instructions to take antibiotics and hydromorphone, a pain killer.  *Id*. at 482.

b.  <u>Medical History After Onset</u>

From 2010-2012, Ms. Henneghan had sporatic appointments with Optimus Health Care (Bridgeport).  [R. at 506-507.]  At an unidentified time, Henneghan relocated to North Carolina.  On April 2, 2012, she reported to Triumph, a North Carolina healthcare provider specializing in psychiatric and behavioral treatment. [R. at 522; *see also* *http://www.triumphcares.com/aboutus.html*.]  The intake assessment from Triumph reported that Henneghan was previously admitted to

Holly Hill Hospital (HHH) from March 10, 2012 through March 21, 2012 exhibiting suicidal ideation without a plan. [R. at 510]. After her hospitalization, she began attending a substance abuse program at the Healing Place. *Id.* She claimed her substance abuse was an attempt to kill herself and went to Triumph seeking mental health treatment for depression and anxiety. *Id.* The Provisional Licensed Clinical Social Worker (P-LCSW) at Triumph, Kathryn Holt, gave a diagnosis of "Major Depressive Disorder, Recurrent, Severe with Psychotic features," Anxiety Disorder Not Otherwise Specified (NOS), and alcohol, cocaine, and opioid dependence. [R. at 518-20]. Although Ms. Henneghan reported abuse as a child, domestic violence, and seeing someone shot in the head 14-15 years prior, the clinician stated she "did not report enough criteria to meet a diagnosis of PTSD." *Id.* The Clinician recommended individual therapy, medical management, a psychiatric evaluation and wellness management and recovery. [R. at 520].

On April 17, 2012, Plaintiff reported to Rock Quarry Family Medicine (RQFM) in Raleigh, North Carolina as a new patient. [R. at 431-32.] The examiner, Dr. James Hartye, identified tenderness in Plaintiff's paraspinous muscle, a possible skin rash and minimal joint line tenderness of the knee. [R. at 432.] Dr. Hartye noted that Henneghan's medical history included high blood pressure, GERD, anemia, tobacco and opioid use, foot pain, a family history of breast cancer, and a malar rash. [R. at 431.]

In May 2012, Henneghan continued attending the substance abuse program the Healing Place and going for medication management visits at Triumph. [R. at 398, 522-523.] In August 2012, Dr. Hartye at RQFM examined Henneghan and

noted her hypertension, foot pain, anemia, GERD, depression, malar rash, and tobacco abuse were unchanged. [R. at 419.] Dr. Hartye noted that Henneghan was prescribed Risperdal, an antipsychotic, by a psychiatrist at Triumph and found Henneghan was "ok" on that medication. *Id.*

On January 7, 2013 and February 28, 2013, Ms. Henneghan had follow-up visits with Dr. Hartye at RQFM, and he noted that Plaintiff's depression had improved. [R. at 531, 526.]

On September 9, 2013, Plaintiff returned to Optimus Health Care in Connecticut for a "well person physical" and complained of dizziness and right leg pain with numbness. [R. at 697.] Plaintiff indicated that she was "constantly depressed and feeling suicidal" and that she would like to see a therapist. *Id.* Howard Smith, a Physician's Assistant (PA), conducted an examination which did not reveal any abnormal physical findings. [R. at 698-700.] PA Smith indicated the Plaintiff possibly had "neuropathy in her upper and lower extremities but has not been seen by a neurologist." [R. at 701.] Plaintiff was referred for psychiatric evaluation of her anxiety and depression. [R. at 702.]

Plaintiff returned to Optimus Health Care on October 7, 2013 for a follow-up visit with an additional complaint of right foot swelling with tingling sensations. [R. at 693.] PA Smith indicated he would refer the Plaintiff to a psychiatric provider again so she could reestablish care. *Id.*

On November 25, 2013, Plaintiff relapsed on opiates and cocaine. Plaintiff was admitted to Kinsella Treatment Center on November 26, 2013. [R. at 542-543.] She began using methadone as a part of her substance abuse treatment. [R. at

551.] On December 30, 2013, Plaintiff requested an increase in her methadone, stating that she was "still using" and having cravings. [R. at 558.]

On January 16, 2014, Plaintiff presented at the Bridgeport Hospital emergency room. [R. at 612.] She reported "having thoughts of hurting [her]self and others." [R. at 613.] When asked if she was suicidal or homicidal, Plaintiff state "not really" and "I really just need a long break from my husband." [R. at 614.] She also admitted to using $40-100 worth of crack cocaine daily and heroin several times a week. [R. at 613-614.] Her psychiatric evaluation indicated that she presented with hallucinatory voices which said "destructive things," but her risk levels for suicide, self-harm, homicide and violence were low. [R. at 617.] Plaintiff was discharged on January 20, 2013. [R. at 613.] Staff at Kinsella Treatment Center were notified of Plaintiff's admittance to Bridgeport Hospital. [R. at 556.]

At a March 13, 2014 follow up at Optimus Health Care, Plaintiff was seen by Dr. Stewart Raymond, and she complained that she had feelings of dizziness. [R. at 685.] Physician notes state Plaintiff lost 35 pounds since her visit in September. *Id.* Plaintiff stated she lost her appetite and denied using drugs. *Id.* At a follow-up on March 19, 2013, Plaintiff alleged bilateral foot pain. [R. at 680.] Plaintiff was referred to podiatry and told to take over-the-counter pain medication for foot pain and to avoid wearing shoes with heels. [R. at 683.]

On March 25, 2014, Plaintiff reported to treatment staff at Kinsella that she was "us[ing] about every other day." [R. at 552.] She requested another

methadone dosage increase.  *Id.*  Plaintiff indicated an interest in going to inpatient treatment.  *Id.*

Plaintiff was admitted to New Prospects (an inpatient treatment facility) on March 31, 2014.  [R. at 655.]  In her intake forms, Plaintiff indicated her abilities were "[p]aperwork[,] school[,] [l]ove working and helping people."  [R. at 657.] Plaintiff's mental examination showed she was cooperative, had decreased motor activity, normal speech, a depressed mood, full range of affect, coherent thought processes and unremarkable thought content.  [R. at 667.]  Plaintiff showed no risk of suicide, homicide and did not indicate having a history of violence.  [R. at 668.]  Her concentration and abstract reasoning were deemed intact and her intellectual function was estimated as above average.  *Id.*

On April 1, 2014, Plaintiff was taken to the emergency room for complaints of right leg pain.  [R. at 573.]  Plaintiff told the emergency department physician Dr. Zellner that she "ran out of her Lyrica [pain medication] several months ago." [R. at 574.]  An examination showed no abnormal findings.  *Id.*  Plaintiff was discharged on April 2, 2014.  [R. at 576.]

On June 6, 2014, Plaintiff returned to the shelter late and agitated.  [R. at 741-746.]  She was taken to the emergency room and released to the shelter after a negative urine toxicology screen.  [R. at 743-744].  On June 10, 2014, Plaintiff returned to Dr. Raymond for a follow-up examination.  [R. at 675-79].  Plaintiff had gained weight and reported seeing a social worker for stress.  [R. at 675].  She stated that she was depressed but not suicidal or homicidal.  *Id.*  Dr. Raymond indicated Plaintiff needed prescription refills.  [R. at 679].

Later that day, Plaintiff was taken to the emergency room after she had an "altered mental status related to hypoglycemia." [R. at 747.] After her mental status was resolved, she was examined, denied suicidal and homicidal ideations, exhibited linear thought processes, and reported no hallucinations. *Id.* Plaintiff reported that she had repeated hypoglycemic episodes and the examining doctor ordered her to discontinue her prescription of Metformin. [R. at 749.] Plaintiff was advised to follow up with her psychiatrist, as a safe house director reported Plaintiff was delusional and paranoid after discharge. [R. at 750.]

On June 19, 2014, plaintiff was taken to the emergency room after stating that she did not want to live anymore, fell, and was unresponsive for about 10 seconds. [R. at 722.] Plaintiff denied she was suicidal. *Id.* A physical examination showed no acute distress and that she had "no focal neurological deficit" that was observed. [R. at 723.] According to her discharge documentation on June 20, 2014, Plaintiff had intact memory, was able to focus, had coherent thoughts, denied hallucinations, and was capable of reality-based thinking. [R. at 725].

On July 21, 2014, Plaintiff had a follow-up visit at Optimus Health Care, and was seen by PA Smith. Plaintiff complained of pain under her left breast. [R. at 670.] The report indicated Plaintiff was not using drugs. [R. at 671.] PA Smith indicated that the chest pain was likely muscle strain. [R. at 673.]

c. Procedural History

August 1, 2012, the plaintiff filed an application for Disability Insurance and Supplemental Security Income Benefits. [R. at 22.] In both applications, the

plaintiff alleged disability beginning July 1, 2010. *Id.* On December 5, 2012, the Social Security Administration determined that the Plaintiff was not entitled to benefits and denied her claims. *Id.* Reconsideration was denied on April 30, 2013. *Id.* The case was assigned to Administrative Law Judge I.K. Harrington. (ALJ Harrington). [R. at 34.] ALJ Harrington held a hearing on July 23, 2014. [R. at 22.] On November 14, 2014, ALJ Harrington issued an unfavorable decision for the Plaintiff. [R. at 34.]

ALJ Harrington issued several findings in his decision on November 14, 2014. [R. at 22-34.] ALJ Harrington determined Plaintiff did not engage in substantial gainful activity since July 1, 2010, the alleged onset date. [R. at 23.] The ALJ found Plaintiff suffered from the following severe impairments: bipolar disorder, major depressive disorder, and poly-substance abuse as defined under 202 C.F.R. § 404.1520(c) and §416.920(c). [R. at 25.] ALJ Harrington determined plaintiff's migraines, diabetes mellitus, hypertension, anemia and edema in her lower extremities to be non-severe. [R. at 25.] The ALJ ruled Plaintiff had the residual functional capacity ("RFC") to perform "medium work as defined in CFR 404.1567(c) and 416.967(c) except she can perform simple routine tasks involving no more than simple, short instructions and simple work-related decisions with few workplace changes and occasional interaction with the general public, co-workers and supervisors." [R. at 28.] Based on a vocational expert's testimony, the ALJ found that jobs existed in significant numbers in the national and local economy appropriate for someone wit Henneghan's RFC, including work as a

janitor, hand packager, or laundry worker. *Id.* The ALJ found Henneghan not qualified for disability or supplemental social security income. *Id.*

Plaintiff filed a request for Review by the Appeals Council on February 16, 2015. [R. at 17.] On July 18, 2016, the Appeals Council denied the Plaintiff's Request for Review, making ALJ Harrington's decision final. [R. at 1-6.] Plaintiff commenced the instant action on September 6, 2016. [Dkt. at 1.]

## II.   Standard of Law

The Social Security Act establishes that benefits are payable to individuals who have a disability. 42 U.S.C. § 423(a)(1). "The term 'disability' means . . . [an] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ." 42 U.S.C. § 423(d)(1). In order to determine whether a claimant is disabled within the meaning of the SSA, the ALJ must follow a five-step evaluation process.[3] A person is disabled under the Act when their impairment is "of such severity that he is not only unable to do his

---

[3]  The five steps are as follows: (1) The Commissioner considers whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the Commissioner must ask whether, based solely on the medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience; (4) if the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has the residual functional capacity to perform his or her past work; and (5) if the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps. 20 C.F.R. § 416.920(a)(4)(i)—(v).

previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.§ 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842 (2d Cir. 1981). The Court's function is to ascertain whether the Commissioner applied the correct legal principles in reaching his conclusion, and whether the decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). The Second Circuit has defined substantial evidence as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the Commissioner's decision applies the correct legal principles and is supported by substantial evidence, that decision will be sustained. *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982).

III.    Discussion

Plaintiff moves for reversal and remand of the ALJ's decision on four grounds, asserting the ALJ (1) failed to develop the record, (2) failed to make a proper severity finding, (3) failed to properly evaluate Plaintiff's claim under the Listing of Impairments, and (4) failed to properly determine Plaintiff's RFC. The Court considers each argument below.

a.    Development of the Record

Plaintiff asserts the ALJ did not acquire Plaintiff's records from her psychiatric hospitalization at Holly Hill Hospital in North Carolina. [Dkt. 17-1 at 12.] In addition, at the hearing, Plaintiff's representative notified the ALJ that Plaintiff's current mental health treatment provider, Dr. Jose Camacho, had medical records which were not included in the record. *Id.* However, the ALJ did not take steps to obtain those records. *Id.*

The Commissioner responds that the ALJ requested Plaintiff's records from Holly Hill Hospital, but the provider never responded. [Dkt. 18 at 21 (citing R. at 96, 112, 130, 149).] The Commissioner also asserts the ALJ did not err in failing to secure Dr. Camacho's records, because when Plaintiff's representative mentioned Dr. Camacho at the hearing, the ALJ asked Plaintiff's representative to submit his records within thirty days. *Id.* at 23 (citing R. at 46, 88). The Commissioner asserts the ALJ fulfilled his duty to develop the record by making this request. *Id.*

Because a social security disability hearing is non-adversarial, the ALJ bears responsibility for ensuring that an adequate record is developed. *See Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–09 (2d Cir. 2009); *Casino–Ortiz v. Astrue*, 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007) (citing *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996)). The ALJ must make "every reasonable effort" to help an applicant obtain medical reports from his medical sources. 20 C.F.R. §§ 404.1512(d), 416.912(d). "The record as a whole must be complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity." 20 C.F.R. § 404.1513(e)(1)-(3)). Where there are suggestions in the record that

additional, available information would have been helpful to the ALJ's determination, the ALJ must attempt to fill the gaps in the record before discrediting the opinion. *Austin v. Astrue*, 2010 WL 7865079, *9–10 (D. Conn. Sept. 30, 2010) (citing *Perez*, 77 F.3d at 47).

"When an unsuccessful claimant files a civil action on the ground of inadequate development of the record, the issue is whether the missing evidence is significant." *Santiago v. Astrue,* 2011 WL 4460206, at*2 (D. Conn. Sept. 27, 2011) (citing *Pratts v. Chater,* 94 F.3d 34, 37–38 (2d Cir. 1996)). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders,* 129 S. Ct. 1696, 1706 (2009).

In this case, the ALJ failed to take adequate steps to secure Dr. Camacho's records. The record indicates that the ALJ asked Plaintiff's representative to submit Dr. Camacho's records within 30 days, but the record does not indicate that the ALJ took any other steps to secure those records. [R. at 45-46.] The Second Circuit considered a similar situation in *Jordan v. Commissioner*, 142 F. App'x 542 (2d Cir. 2005). In *Jordan*, the claimant's representative volunteered at the administrative hearing to secure a treating physician's records. *Id.* However, in *Jordan*, the ALJ fulfilled his duty to develop the record because the ALJ "later contacted counsel to remind him that no evidence had been received and that a decision would be made on the existing record unless such evidence was timely submitted, [and] counsel subsequently contacted the Social Security Administration to advise it that Jordan had nothing further to add to the record."

*Id.* Here, there is no evidence that the ALJ followed up with Plaintiff's representative.

In addition, the omission of Dr. Camacho's records was significant. The ALJ was obligated to "develop [claimant's] complete medical history for at least the 12 months preceding the month in which [the claimant] file[d] [her] application." 42 U.S.C. § 423(d)(5)(B); *Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 83 (2d Cir. 2009). Plaintiff testified she had been seeing Dr. Camacho for the eight months preceding the hearing; his records of psychiatric treatment fall within the 12-month span preceding Plaintiff's application for which the ALJ was obligated to secure records. *Id.* at 45. Further, Dr. Camacho's records would have been entitled to controlling weight under the treating physician rule, and their omission warrants remand for further development of the record. *See, e.g.*, *Burgos v. Berryhill*, 2018 WL 1082400, at **3-4 (D. Conn. Feb. 28, 2018) (remanding for further development where records of a treating physician were omitted from the record).

However, the record indicates that the ALJ did meet his obligation to secure records from Holy Hill Hospital. The ALJ was required to make "every reasonable effort" to secure records from Plaintiff's medical sources. 20 C.F.R. § 404.1512(b)(1)(i). Every reasonable effort means the ALJ must "make an initial request for evidence from [the claimant's] medical source . . . and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, [the ALJ] will make one follow-up request to obtain the medical evidence necessary to make a determination." *Id.* The ALJ must give the medical

source "a minimum of 10 calendar days from the date of [the ALJ's] follow-up request to reply, unless [the ALJ's] experience with that source indicates that a longer period is advisable." *Id.* Here, the ALJ made two requests for records from Holy Hill Hospital and closed the record more than ten days after the final request. [R. at 149 (showing records were requested on October 2, 2012 and October 18, 2012, and that the record was open at least until April 2013).]

Plaintiff's motion to remand for further development of the record as to Dr. Camacho's records is GRANTED; her motion to remand for further development of the record as to Holy Hill Hospital's records is DENIED.

b. <u>Severity Findings</u>

Plaintiff asserts the ALJ should have found her diabetes and peripheral neuropathy to be severe impairments because they are severe and irreversible conditions. [Dkt. 17-1 at 13.]

The Commissioner preliminarily responds that where, as here, the ALJ proceeds with the sequential analysis and reaches an RFC finding that accurately reflects the claimant's functioning based on substantial evidence, arguments attacking the ALJ's severity finding at step two is not a basis for remand. [Dkt. 18 at 26 (citing *O'Connell v. Colvin*, 558 F. App'x 63, 64 (2d Cir. 2014)).] Further, the Commissioner notes that record evidence indicated that proper medication would adequately control Plaintiff's condition, and points out that a permanent condition does not necessarily cause permanent disabling symptoms. *Id.* (citing R. at 25, 409-10).

At Step Two of the disability analysis, the Court must evaluate the medical opinions and evidence to determine whether the plaintiff has "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 1520(a), (c). "The severity regulation requires the claimant to show that he has an 'impairment or combination of impairments which significantly limits' 'the abilities and aptitudes necessary to do most jobs.'" *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (quoting 20 C.F.R. §§ 404.1520(c), 404.1521(b)). It is the plaintiff's burden to provide "medical evidence which demonstrates the severity of her condition." *Merancy v. Astrue,* No. 3:10 cv 1982 (WIG), 2012 WL 3727262, at *7 (D. Conn. May 3, 2012).

It is well established in this Circuit that the omission of one or more severe impairments at step two may "be deemed harmless where the ALJ also later considers the effects from the omitted impairment as part of the ultimate RFC determination." *Matta v. Colvin*, 2016 WL 524652, at *12 (S.D.N.Y. Feb. 8, 2016) (emphasis added) (quoting *Melendez v. Colvin*, 2015 WL 5512809. at *5 (N.D.N.Y. Sept, 16, 2015)).

Here, the ALJ found that Plaintiff suffers from three severe impairments: bipolar disorder, major depressive disorder, and poly-substance abuse. [R. at 25.] The ALJ found each of those impairments caused more than minimal limitations on Plaintiff's ability to perform basic work functions, and that either singly or in combination, they caused Plaintiff significant limitations. *Id.* The ALJ did not, however, find Plaintiff's migraines, diabetes, hypertension, anemia, or

adema in her lower extremities to be severe, as record evidence indicated they were effectively managed through medical attention. *Id.*

The Court finds that the ALJ did consider Plaintiff's diabetes and related neuropathy as part of the RFC analysis. [*See* R. at 28 (considering Plaintiff's testimony that she experiences Plaintiff asserted she experienced peripheral neuropathy as a result of her diabetes, and has taken Neurontin and Lyrica and also relies on ice to treat her pain); R. at 32 (considering Ms. Wokono's testimony that Plaintiff is "weak" but finding her physical symptoms did not limit her RFC because of Plaintiff's testimony that she completes chores, runs errands, and performs self-care).] Accordingly, any error in failing to consider Plaintiff's diabetes and neuropathy at step two is harmless. *Matta*, 2016 WL 524652 at *12.

In addition, even if the error were not harmless, the Court concludes that Henneghan has failed to show that her impairment resulting from diabetes is "severe." *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). Rather, while the Court understands that diabetes and related peripheral neuropathy are permanent conditions, a claimant may have a permanent condition without experiencing a severity of symptoms which render her disabled. *See, e.g., Thornton v. Colvin*, 2016 WL 525994, at *9 (finding that medical notes discussing the claimant's permanent condition said "little if anything about the severity of the patient's symptoms, and nothing at all about whether the symptoms or effect of the condition render the patient disabled"). Record evidence shows that Plaintiff's symptoms associated with diabetes and peripheral neuropathy are controlled with proper medication, and as such the ALJ did not err in finding those

conditions not severe.  **[R. at 768 (noting when Plaintiff presented with severe peripheral neuropathy pain that Plaintiff ran out of prescription medication to control that pain months prior); R. at 670-72 (noting no report of peripheral neuropathy pain when Plaintiff took prescription medication).]  Plaintiff's motion to reverse on this ground is DENIED and the Commissioner's motion to affirm is GRANTED.**

        c.  <u>Listing Impairment Findings</u>

        **Plaintiff asserts the ALJ should have found that her bipolar disorder constitutes a listed impairment under listing 12.04.  [Dkt. 17-1 at 15.]  Plaintiff asserts she is markedly impaired in activities of daily living, as she has trouble getting out of bed, stays in a dark room with the blinds closed, neglects self-care, engages in infantile behavior, and has feelings of sadness, crying spells, trouble sleeping, concentration problems, irritability, hopelessness, thoughts of suicide, and experienced at least two suicide attempts.  *Id*. at 15-16 (citing R. at 537) (self-report of symptoms).  Plaintiff also asserts she is markedly impaired in social functioning, based on her history of homicidal ideation, adolescent tendency to fight, as well as her June 2014 presentation to the emergency room exhibiting defensiveness and irritability.  [*Id*. at 16 (citing R. at 516 (self-reported homicidal ideation), 537 (self-reported symptoms listed above), 640 (June 2014 emergency room record noting admission for suicidal and homicidal ideation in the context of substance abuse and abusive romantic relationship, noting Plaintiff was irritable and agitated)).]  Plaintiff also notes that case manager Wokono testified that Plaintiff is often paranoid, difficult to engage, and has difficulty getting along**

with others. *Id.* at 16 (citing R. at 67 (Ms. Wokono's hearing testimony)).  Finally,

Plaintiff also asserts she is markedly impaired in concentration and persistence,

citing Dr. Akpaka's consultative opinion that her ability to perform tasks that

require sustained concentration and persistence is significantly limited by her

mood symptoms and low intelligence.[4]  *Id.* at 16-17.

Commissioner responds that Plaintiff "simply ignores" other record

evidence in favor of her own self-reported description of her symptoms and one

consultative opinion.  [Dkt. 18 at 30-31.]  Commissioner emphasizes that Dr.

Akpaka's evaluation is contradicted by records from other medical providers,

including consultative examiners Dr. Meier and Dr. Wax, who both found Plaintiff

did not have marked restrictions in activities of daily living.  [Dkt. 18 at 30-31.]

Commissioner also asserts the ALJ's finding is supported by evidence that

Plaintiff worked in jobs requiring social interaction, almost obtained a bachelor's

degree, interacted appropriately with medical providers, and enjoyed good

relationships with family members.  *Id* at 32 (citing R. at 55, 278, 511).

"For a claimant to show that his impairment matches a listing, it must meet

all of the specified medical criteria.  An impairment that manifests only some of

those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493

---

[4] On April 9, 2013, Plaintiff underwent a consultative evaluation with Dr. Ernest
Akpaka, PhD.  [R. 537].  Dr. Akpaka found that Plaintiff's presentation "suggests
polysubstance dependence in remission and bipolar I disorder versus recurrent
major depressive disorder."  *Id.* at 537-40.  He opined that she was "capable of
understanding, retaining and following simple instructions, and sustaining
enough attention to perform simple repetitive tasks and routine. Her mental
ability to perform tasks that require sustained concentration and persistence and
tolerate the stress associated with day-to-day regular work activity is significantly
limited by her mood symptoms and her estimated low average intellectual
functioning.  Her mood symptoms may also impede her ability to relate to others
including coworkers and supervisors."  *Id.* at 540.

U.S. 521, 530 (1990).  The plaintiff bears the burden of showing that an impairment

meets the specified criteria.  *Id.*

The listed impairments the ALJ considered in this case are listings 12.04

and 12.09.  In order to meet the requirements of listing 12.04, the claimant's

affective disorder must cause at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

Or, the claimant's affective disorder must cause a "medically documented

history of a chronic affective disorder of at least 2 years' duration that has

caused more than a minimal limitation of ability to do basic work activities,

with symptoms or signs currently attenuated by medication or

psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A, § 12.04.

Listing 12.09 for Substance Addiction Disorders is a "reference listing,"

and is evaluated using the requirements of other listings, including affective

disorders (12.04).  Listing 12.09 serves "to indicate which of the listed mental or

physical impairments must be used to evaluate the behavioral or physical

changes resulting from regular use of addictive substances." DI 34132.005, *available at https://secure.ssa.gov/poms.nsf/lnx/0434132005.* For Listing 12.09 to apply, the Commissioner must find the claimant would be disabled if he stopped using drugs or alcohol. *Gordon v. Commissioner of Social Sec.,* slip op., No. 3:10–cv–00124 NPM, 2012 WL 669854, at *3 (N.D.N.Y. Feb. 29, 2012) (citing *Hernandez v. Astrue,* 814 F.Supp.2d 168, 181 (E.D.N.Y. 2011)).

In this case, the ALJ did consider Plaintiff's own testimony about her symptoms, but found Plaintiff's testimony contradicted by her own testimony about her ability to do chores, run errands, and socialize with family. [R. at 26.] In addition, the ALJ considered Ms. Wokono's testimony [R. at 29] and Dr. Akpaka's medical opinion [R. at 31-32], but found them outweighed by record evidence that Plaintiff "functions independently and engages in daily activities," "interacts in an appropriate manner," reads, shops with her mother, and attends an outpatient treatment program three days per week. [R. at 26.] Based on all record evidence, the ALJ found no "marked" impairment in daily living activities, maintaining social functioning, concentration, persistence, or pace. [R at 26-27.]

In addition, the ALJ found support for his finding of no listed impairment in Dr. Meier's consultative opinion. [R. at 27.] Dr. Meier reviewed Plaintiff's medical records on November 30, 2012, and found that Plaintiff has received inpatient treatment for substance abuse but has not been hospitalized for psychiatric treatment. R. at 99. Records indicated that when Plaintiff's substance abuse is in remission, Plaintiff reports decreased depression, and her appearance, orientation, and thought organization are all normal. *Id.* Dr. Meier noted that

Plaintiff reported the ability to clean her home, cook meals, read up to 45 minutes at a time and remember what was read, and the ability to socialize with family and friends.  *Id.*  Based on those findings, Dr. Meier concluded that Plaintiff did not have a "medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities."  *Id.*  The ALJ gave this opinion substantial weight based on Dr. Meier's program knowledge, specialty in mental impairments, and explanation of his findings.  R. at 27.

The ALJ's decision was adequately supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Williams*, 859 F.2d at 258.  Plaintiff's assertion that the ALJ should have come to a different conclusion in light of the record evidence, without more, is not a basis for reversing or remanding the ALJ's decision.  *See Penfield v. Colvin*, 563 F. App'x 839, 840 (2d Cir. 2014) (rejecting claimant's argument that the ALJ should have given more weight to a medical opinion and claimant's characterization of her symptoms where the ALJ's decision was supported by other record evidence).  Plaintiff's motion to reverse on this ground is DENIED, and the Commissioner's motion to affirm is GRANTED.

d.  RFC Determination

Plaintiff asserts the ALJ erred in finding that she had the residual functional capacity to do medium exertional work.  [Dkt. 17-1 at 18-19.]  Plaintiff asserts the ALJ's finding is inconsistent with her own testimony and case manager Wokono's testimony that Plaintiff experiences physical weakness,

dizziness, and neuropathy which prevent her from completing chores. *Id.* at 19. Because of this, Plaintiff asserts the ALJ should have limited her RFC to work not involving heights, hazards, and moving machinery, and should have limited her physical exertion to less than medium exertional work. *Id.* at 19. In addition, Plaintiff asserts that the ALJ should have limited her to work involving no interaction with coworkers or the general public. *Id.* at 19-20. In support, Plaintiff notes her history of fighting, homicidal ideation, defensiveness, irritability, paranoia, and difficulty getting along with others at the shelter. *Id.* at 19 (citing R. at 516, 537, 540).

Commissioner asserts Plaintiff has merely recited evidence the ALJ considered and found unpersuasive, without showing that the ALJ's decision was irrational or unreasonable. *Id.* For example, Commissioner notes that the ALJ considered Plaintiff's and Ms. Wokono's testimony that Plaintiff was limited in her ability to engage in social interactions, but found that testimony outweighed by other record evidence including Plaintiff's own testimony about her daily activities and higher education. *Id.* Commissioner also asserts the ALJ's RFC finding is supported by the opinions of state agency medical consultants Dr. Jessup and Dr. Jimenez-Medina. [Dkt. 18 at 35 (citing R. at 101, 17, 135, 154).]

Residual functional capacity ("RFC") is "what an individual can still do despite his or her limitations." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and

the RFC assessment must include a discussion of the individual's abilities on that basis.4 A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.* RFC is "an assessment based upon all of the relevant evidence ... [which evaluates a claimant's] ability to meet certain demands of jobs, such as physical demands, mental demands, sensory requirements, and other functions." 20 C.F.R. § 220.120(a).  RFC is "an assessment based upon all of the relevant evidence . . . [which evaluates a claimant's] ability to meet certain demands of jobs, such as physical demands, mental demands, sensory requirements, and other functions." 20 C.F.R. § 220.120(a).

"When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  However, the ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Id.*

In this case, the ALJ's conclusion that Henneghan can perform medium exertional work is supported by substantial record evidence.  The ALJ explicitly considered Plaintiff's reported symptoms, including poor sleep, crying spells, lack of motivation, suicidal ideations, hallucinations, frustration, poor focus, and peripheral neuropathy.  [R. at 28.]  The ALJ also considered case manager Wokono's testimony that Plaintiff is physically weak, and at times has had difficulty interacting with other shelter residents or appeared paranoid.  [R. at 29.]

The ALJ found Plaintiff and Ms. Wokono's testimony credible in that each reflected that Plaintiff has limitations, but found their testimony incredible insofar as they testified that Plaintiff is unable to perform any work activities or to interact with others. *Id.* at 32. The ALJ found that testimony inconsistent with Plaintiff's testimony that she performs assigned chores, attends outpatient substance abuse meetings for three hours each day, maintains her own personal care, prepares meals, does her own laundry, and gets along with others. *Id.* at 32.

The ALJ also noted that Plaintiff's medical records reflect a history of "sporadic" treatment for major depressive disorder and bipolar disorder commingled with active substance abuse. *Id.* at 29. The ALJ noted that on multiple occasions when Plaintiff sought emergency department treatment based on her mental status, she was discharged in stable condition. *Id.* at 29-30. The ALJ emphasized that Plaintiff's depression improved with treatment compliance and sobriety. *Id.* at 30.

The ALJ also assigned substantial weight to the opinion of state agency medical consultants Dr. Evelyn Jimenez-Medina and Dr. Pamela Jessup, each of whom assessed that the Plaintiff could lift and carry up to fifty pounds occasionally and twenty-five pounds frequently, and stand and or walk about 6 hours in an 8-hour workday. [R. at 135-36.] The ALJ also gave substantial weight to the mental health residual functional capacity conclusions of state agency psychological consultants Dr. Wax and Dr. Meier, each of whom found that Plaintiff had only mild restrictions in her daily activities, moderate difficulty maintaining social functioning, and moderate difficulty in maintaining

concentration, persistence and pace. [R. at 31, 99, 124.] The ALJ found each of those four opinions consistent with the record as a whole.

By contrast, the ALJ gave partial weight to Dr. Akpaka's opinion that Plaintiff could perform simple, routine, repetitive tasks such as managing her own bank account. *Id.* at 31-32. However, the ALJ found Plaintiff's own testimony regarding her daily activities indicated a higher intellectual functioning capacity than Dr. Akpaka found. *Id.*

The ALJ concluded that, in light of Plaintiff's treatment history, objective clinical findings, Plaintiff's subjective complaints, and the medical opinions and evidence in the record, Plaintiff has the capacity to perform the full range of medium exertional work with the added limitations that she can perform simple routine tasks involving no more than simple, short instructions and simple work-related decisions with few workplace changes and occasional interaction with the general public, co-workers, and supervisors. *Id.* at 28.

Plaintiff asserts that the ALJ should have come to a different conclusion in light of Ms. Wokono's testimony and Plaintiff's own testimony about her symptoms. However, as stated previously in this decision, the ALJ did consider that evidence, and the ALJ's ultimate conclusion as to Plaintiff's RFC is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Williams*, 859 F.2d at 258.

In addition, Plaintiff's assertion that her RFC should reflect an inability to perform work involving heights, hazards, or moving machinery, even if true, would not undermine the ALJ's RFC analysis. In fact, the ALJ found that Plaintiff

could work as a janitor, hand packer, or laundry worker, none of which require encountering heights, hazards, or moving machinery.  R. at 33; *Cleaner, Industrial*, DICTIONARY OF OCCUPATIONAL TITLES, 381.687-016, 1991 WL 673258 (2016) (stating janitorial work does not require working with heights or hazards, and might require operating an industrial truck to transport materials within a plant, but would not necessarily require it); *Packager, Hand*, DICTIONARY OF OCCUPATIONAL TITLES, 920.587-018, 1991 WL 687916 (2016) (stating hand packaging does not require working with heights, hazards, or moving machinery); *Laundry Worker II*, DICTIONARY OF OCCUPATIONAL TITLES, 361.685-018, 1991 WL 672987 (2016) (stating laundry work does not require working with heights, hazards, or moving machinery).  Henneghan's motion to reverse on the ground that her dizziness, fainting, and ability to interact with others requires a more restricted RFC finding is DENIED and the Commissioner's motion to affirm is GRANTED.

IV.    Conclusion

For the reasons set forth above, Henneghan's Motion to Remand the Commissioner's Decision [Dkt. No. 17] is GRANTED in part and DENIED in part. This case is remanded for further development of the record consistent with this decision.

It is so ordered this 14th day of March 2018, at Hartford, Connecticut.

_____/s/_____

Vanessa L. Bryant, U.S.D.J.